## Begley v. Commonwealth.

(Decided October 23, 1923.)

## Appeal from Perry Circuit Court.

1. Criminal Law—Continuance Held Not Erroneously Refused for Absent Witness.—In a homicide case the court did not err to defendant's prejudice in refusing a continuance for an absent witness whose testimony was only corroborative of that introduced on the trial, the affidavit as to such testimony being read on the trial, especially where the affidavit failed to show a reasonable probability of defendant's being able to procure the attendance of the absent witness at a succeeding term.

2. Criminal Law—Refusal to Grant Continuance Not Disturbed in Absence of Abuse.—The Court of Appeals will not interfere with the discretion of a trial court in the matter of granting or refusing a continuance, or reverse a conviction for failure to grant a continuance unless it is clearly shown by the record that there was an abuse by that court of such discretion.

3. Homicide—Evidence Held to Sustain Conviction of Voluntary Manslaughter.—Evidence held sufficient to sustain a conviction for voluntary manslaughter.

4. Criminal Law—Conviction Not Reversed in Absence of Showing Evidence Did Not Support.—The Court of Appeals will not reverse a judgment of conviction on the ground that the verdict is contrary to the evidence, in the absence of a showing by the record that it is unsupported by or is flagrantly against the evidence.

JESSE MORGAN, F. J. EVERSOLE and J. T. BOWLING for appellant.

THOS. B. McGREGOR, Attorney General, CHAS. W. LOGAN, Assistant Attorney General, and C. W. NAPIER, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

March 12, 1921, the appellant, Curt Begley, shot and fatally wounded Gus Begley in or near the village of Krypton, Perry county, Kentucky. The Begleys were first cousins, Curt then being 25 and Gus 18 years of age. The shooting occurred late in the afternoon, but while there was yet light sufficient to distinguish persons and objects. Immediately following the shooting the wounded man ran down a railroad track leading through Krypton; but the flight thus begun soon subsided into a staggering walk, which continued until he arrived at the residence of George Eversole, about three hundred yards from the place of the shooting, where Eversole, seeing his suffer-

ing and exhaustion, took him into his home, laid him on a bed, forthwith summoned his father, Green Begley, to his assistance and also procured for him the attendance of Dr. Young, a nearby physician. On the advice of the physician, and with money furnished by him and Eversole for that purpose, the father carried the wounded son by train that night to a hospital in the town of Jackson, Breathitt county, conducted by Dr. Wilgus Bach, where they arrived at nine o'clock p. m. On the same night the wounded man was subjected to a surgical operation at the hands of Dr. Bach, which, though indispensably necessary, failed to afford any relief, other than an apparently temporary alleviation of his sufferings. He died of the wound on the morning of March 15th, three days after it was received.

On May 4, 1921, and 3rd day of the May term of the Perry circuit court that year, the grand jury returned in that court an indictment against the appellant charging him with the murder of Gus Begley. His trial under the indictment for the crime charged occurred at the January term, 1923, of the Perry circuit court, and resulted in a verdict finding him guilty of voluntary manslaughter, and fixing his punishment at imprisonment of twenty-one years in the penitentiary. Complaining of that verdict, the overruling by the trial court of his motion and grounds for a new trial and of the judgment entered upon the verdict, he has appealed.

Only two of the numerous grounds relied on by the appellant in the court below for a new trial are urged on the appeal for the reversal sought of the judgment of conviction, viz., error of the trial court, (1) in overruling his motion for a continuance of the case; (2) in refusing to grant him a new trial upon the ground that "the verdict of the jury was palpably against the evidence."

Before passing on either of the above contentions, we think it proper to briefly refer to such parts of the evidence introduced on the appellant's trial as may serve to throw light upon his conduct and that of the deceased at the time of and immediately preceding the admitted shooting and wounding by him of the latter. It appears from the testimony of all the witnesses, including the appellant, that the difficulty between him and the deceased began on the railroad track at what is known as the railroad "telegraph operator's tower station," where the appellant had previously been taking some training in te-

legraphy. The evidence is indefinite as to the cause of the difficulty, but indicates that it grew out of an attempt of some one of the several young men then present to stop an unseemly noise being made by a boy in front of a nearby residence, because of its tendency to annoy the owner, who was ill. All of the witnesses for the Commonwealth seem to agree that in some sort of a dispute that occurred between appellant and the deceased over the incident referred to, appellant either called the deceased a liar or was accused by him of doing so; but that when again thus accused by the latter, the appellant denied he had said the deceased was a liar. After beginning this dispute appellant and deceased, together with several other members of the party, walked a short distance down the railroad track and stopped at or near a water tank, where the shooting took place.

- According to the evidence, the following persons, besides the participants, witnessed the shooting, viz., Jim Hinkle, Dutch Hammond, McClellan Hinkle, Burly Miniard, Joe Miniard and Tom Eversole, Jim Hinkle then being within two or three feet of the appellant and deceased, but of the other witnesses named, McClellan Hinkle and Tom Eversole were twenty feet and Burly and Joe Miniard about thirty steps away from the place of the shooting. Obviously, the closer proximity of Jim Hinkle to the appellant and deceased gave him a better opportunity than was afforded the other witnesses to hear and see all that was said and done by each of them at the time of the shooting, and the following excerpt from his testimony will, in part, show what he stated then occurred:

"Well, we was all walking down the track there, and Curt (appellant) said: 'I didn't call him no liar, did I?' and Gus (the deceased) turned around and said, 'Yes, you did call me a liar;' and Curt said, 'No, I didn't; if I did, honey, I beg your pardon,' and Gus said: 'If you beg my pardon it is all right.' Gus said: 'You did call me a liar,' and Curt said, 'All right,' and Gus said, 'If you call me that again,' and Gus went to smacking, and the shooting began."

The witness, Jim Hinkle, also testified that in making the attempt to smack or strike the appellant the deceased only used one of his hands, which contained neither a knife nor other weapon; and the other witnesses present testified that they saw no knife or other thing in his

hand.  Moreover, no knife was found after the shooting
at or near the place of its occurrence, or along the route
taken by deceased in going to the home of George Ever-
sole; and, according to the testimony of Eversole and
Green Begley, by whom the deceased was undressed that
night, there was no knife among the articles they found
on his clothing.

Jim Hinkle further testified that when the deceased
struck at the appellant with his hand the latter escaped
the blow by knocking his hand aside with one of his own
hands, while at the same time drawing with the other
hand the pistol with which he shot the deceased; and that
the first shot from the pistol so quickly followed the at-
tempted blow that they almost appeared to have occur-
red simultaneously.  It also appears from the testimony
of Jim Hinkle, fully corroborated by that of each of the
several other witnesses for the Commonwealth then
present, that the first shot at the deceased from the ap-
pellant's pistol instantly stopped his attack on the appel-
lant and caused him to immediately turn his back upon
the latter and start to run away from him as if to escape
other shots from the pistol; and that while so fleeing, or
in the act of starting such flight, with his back still to-
ward the appellant and yet within a few feet of him, the
latter fired at him the second shot, following which de-
ceased, though fatally wounded, continued his flight until
he arrived at the home of Eversole.

It conclusively appears from the evidence that only
the second of the two pistol shots fired at the deceased by
appellant struck him, and that the bullet entered his back
two inches to the left of the spinal column, passed through
the bowels and stomach and came out at the point of the
breast bone in front, was established by the testimony of
his father and George Eversole, by whom he was un-
dressed after his arrival at Eversole's residence, and
also by that of Dr. Wilgus Bach, who particularly de-
scribed the character of his wound, pronounced it neces-
sarily fatal and declared it the cause of his death.  Dr.
Bach further testified that he informed the deceased of
the fatal character of the wound and of the certainty of
its causing his early death.

After receiving this information from Dr. Bach the
deceased, as appears from the testimony of Green Beg-
ley and Malcolm Holliday, the latter a lawyer of Jack-
son, got Holliday to reduce to writing in his presence a

statement made by him containing, as he claimed, a correct narration of what took place between him and the appellant immediately before and at the time of the shooting. This statement, containing the signature of the deceased and those of Green Begley and Malcolm Holliday as attesting witnesses, was introduced and read in behalf of the Commonwealth on the appellant's trial, the same being in words and figures as follows:

"Jackson, Ky.,

"March 13th, 1921.

"Sunday—I don't believe I can get well. My breath is stopping on me. I know I can't live but just a short time.

"We were at the water tank at Krypton, Burley Miniard, a Hinkle boy and Curtley Begley and me. Mr. Hinkle had just got out of hospital. They were in front of old man Hinkle's house, cutting up, hollooing, and the Hinkle boy said, 'Boys, don't do the old man this way, he is just back out of hospital,' and Curt said, 'You are just a God dam liar, Gus Begley.' I had not opened my mouth, and I said 'Curt Begley, don't talk that way to me, you know I never talk that way to you,' and Curt said, 'Hush, God dam your soul, I aim to kill you any way,' and pulled out his pistol and shot at my face. I dodged the first shot, and started to run and he shot me in the back. That is all there is to it.

"His father then asked him, 'Did you have any gun at all?' and he said, 'No, I didn't have anything.'

"At the time this statement was taken the boy could not lay on his back, but had to lay on his side with his head hanging off the side of the bed. Dr. Bach had just told me that the boy could not live, and that he was liable to die at any moment."

Although fuller in its mention of what was said by each of the participants in the shooting, it will be observed that the statement left by the deceased is in accord with such material facts as were brought out by the testimony of the Commonwealth's living witnesses, and nowhere do we find any substantial variance.

The evidence upon which the appellant rested his defense was furnished by his own testimony and certain alleged facts set forth in his affidavit for a continuance, to which it was therein claimed, Dutch Hammond, an absent witness, would, if present, testify. The continu-

ance asked was refused, but the trial court permitted to be read to the jury in the appellant's behalf, as if it were the deposition of Hammond, Such parts of the appellant's affidavit for the continuance as contained the statement of facts to which, it was claimed, he would testify.

The appellant's testimony was substantially to the effect that after being asked by the deceased at the telegraph operator's tower why he had given him the lie, which he (appellant) then denied he had done, they continued to dispute over the matter until joined by Dutch Hammond, who interposed as a peace maker by advising the deceased not to have any trouble, during the giving of which advice the appellant walked away from them. When the appellant shortly thereafter encountered the deceased at the water tank, his version of what there occurred between them can better be indicated by quoting from his testimony what he claimed then took place:

"He (meaning the deceased) said you didn't give me a lie, and I begged his pardon and told him I was his friend and could not afford to have any trouble and to forget it and leave alone; and he said if you say again you didn't give me the lie I will leave you in that ditch there, and then walked up toward me and grabbed at me; and he had his knife in his hand, and he struck at me with his hand with the knife, and I knocked the lick off, and at the same time I fired two shots as fast as I could. I had my gun in my front pocket, and I jerked it out and fired twice as fast as I could, and missed him the first shot."

It is apparent from the appellant's testimony that much of its corroborates that of the Commonwealth's witnesses as to what was said and done at the time of the shooting and as to the fact that his first shot missed the deceased and the second entered his back. The testimony attributed to the absent witness Hammond by the appellant's affidavit and read to the jury, was substantially identical with that of the appellant and, therefore, corroborative of all that he stated.

The appellant's contention that the trial court erred to his prejudice in refusing him a continuance is not sustained by the record. In the first place, the affidavit of the appellant fails to show that greater diligence or earlier efforts on the appellant's part to ascertain the whereabouts of the witness, would not have enabled him to locate and communicate with him, and thereby pro-

cure his attendance and testimony on the trial. The affidavit also fails to show a reasonable probability of the appellant's being able to procure the attendance of the absent witness at the succeeding term of the court, in the event of a continuance of the case; and, finally, we think it fairly apparent from the record that the appellant as fully obtained the benefit of the testimony of the witness by the reading of it to the jury from the affidavit as if he had given it orally in their presence. In addition to what has been said, the sincerity of the appellant in asking the continuance may well have been questioned by the court in view of the facts that the killing of the deceased occurred twenty-two months before the trial of the appellant took place, and that the latter had obtained a continuance at the previous term on account of the absence of four named witnesses, none of whom was introduced on his trial. No rule of law has been better settled than that this court will not interfere with the discretion of a trial court in the matter of granting or refusing a continuance, or reverse a judgment of conviction for its failure to grant a continuance, unless it is clearly shown by the record that there was an abuse by that court of such discretion, which does not appear in this case. Owen v. Comth., 181 Ky. 257; Brennon v. Comth., 169 Ky. 815; Brown v. Comth., 195 Ky. 166; Whitson v. Comth., 197 Ky. 745; Snider v. Comth., 199 Ky. 655; Graham v. Comlth., 200 Ky. 161.

It is apparent from what we have already said of the evidence that further consideration of it in passing on the appellant's second contention will be unnecessary. Instead of failing to establish the guilt of the appellant as claimed by him, its great weight is to the effect that he shot the deceased in the back when he was running or in the act of running from him following his abandonment of the attack on him, and that the act of the appellant in taking his life was not necessary in his self-defense. Therefore, it was unnecessary and inexcusable. This court will not reverse a judgment on the ground that a verdict is contrary to the evidence in the absence of a showing by the record that it is unsupported by or is flagrantly against the evidence. As in our opinion the appellant was not prejudiced in any of his substantial rights by the rulings of the trial court complained of, the judgment is affirmed.